ALEXANDER J. HADJIS (Admitted pro hac vice)
RICHARD G. GREEN (Admitted pro hac vice)
SONNENSCHEIN NATH & ROSENTHAL LLP
1301 K Street N.W.
Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 408-6399
Email:       ahadjis@sonnenschein.com
             rgreen@sonnenschein.com

STEVEN H. FRANKEL (State Bar No. 171919)
SONNENSCHEIN NATH & ROSENTHAL LLP
525 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 882-5000
Facsimile: (415) 882-0300
Email:       sfrankel@sonnenschein.com

LAURA A. WYTSMA (State Bar No. 189527)
SONNENSCHEIN NATH & ROSENTHAL LLP
601 South Figueroa Street, Suite 1500
Los Angeles, California 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email:       lwytsma@sonnenschein.com

Attorneys for Defendants
CMC MAGNETICS CORP., HOTAN CORP., and
KHYPERMEDIA CORP.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP., <br><br> Defendants. | Case No. C 06-04538 WHA <br><br> AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS CMC MAGNETICS CORP., HOTAN CORP., AND KHYPERMEDIA CORP. <br><br> DEMAND FOR JURY TRIAL |

In response to the Court's November 13, 2006, Order Denying Matsushita's Motion to Dismiss; Motion to Strike; and Granting Motion for a More Definite Statement, and in response to the allegations in the Complaint filed by Plaintiff Matsushita Electric Industrial Co., Ltd. (MEI) on July 26, 2006, Defendants CMC Magnetics Corporation (CMC), Hotan Corporation (Hotan), and KHypermedia Corporation (KHypermedia) (collectively, "Defendants") submit their Amended Answer and Counterclaims, and further allege as follows:

## ANSWER

1. Defendants admit that the Complaint purports to state a cause of action arising under the patent laws of the United States (Title 35, U.S.C., section 271 et seq), and that MEI has requested damages and a permanent injunction. Defendants deny that they infringe the asserted patents and that the asserted patents generally relate to the field of recordable DVDs. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 1 of the Complaint, and therefore deny the same.

2. Defendants lack sufficient information to admit or deny the allegations in Paragraph 2 of the Complaint, and therefore deny the same.

3. Defendants KHypermedia and Hotan deny that they are in the business of manufacturing recordable information media. Defendants admit the remaining allegations in Paragraph 3 of the Complaint.

4. Defendants admit the allegations in Paragraph 4 of the Complaint.

5. Defendants admit that the Court has personal jurisdiction over Defendants, and that Hotan and KHypermedia are organized under the laws of the State of California. Defendants deny the remaining allegations in Paragraph 5 of the Complaint.

6. Defendants admit that venue is proper in this judicial district, but deny the remaining allegations in Paragraph 6 of the Complaint.

7. Defendants deny the allegations in Paragraph 7 of the Complaint.

8. The responses to Paragraphs 1-7 are incorporated herein by reference in response to Paragraph 8 of the Complaint.

9. Defendants admit that U.S. Patent No. 4,847,132 (the '132 patent) bears the title "Protective Layer for Optical Information Recording Medium," that it names Masatoshi Takao, Kunio Kimura, Toshimitsu Kurumizawa, and Kenichi Nagata as inventors, and that it was issued on July 11, 1989. Defendants deny, however, that the '132 patent was duly and legally issued. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 9 of the Complaint, and therefore deny the same.

10. Defendants deny the allegations in Paragraph 10 of the Complaint.

11. Defendants deny the allegations in Paragraph 11 of the Complaint.

12. Defendants deny the allegations in Paragraph 12 of the Complaint.

13. The responses to Paragraphs 1-7 are incorporated herein by reference in response to Paragraph 13 of the Complaint.

14. Defendants admit that U.S. Patent No. 5,790,487 (the '487 patent) bears the title "Optical Information Recording Medium, Optical Information Recording Method, and Optical Information Recording Apparatus Utilizing the Same," that it names Mitsurou Moriya, Osamu Yamaguchi, Yoshihisa Fukushima, and Namio Hirose as inventors, and that it was issued on August 4, 1998. Defendants deny, however, that the '487 patent was duly and legally issued. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 14 of the Complaint, and therefore deny the same.

15. Defendants deny the allegations in Paragraph 15 of the Complaint.

16. Defendants deny the allegations in Paragraph 16 of the Complaint.

17. Defendants deny the allegations in Paragraph 17 of the Complaint.

18. The responses to Paragraphs 1-7 are incorporated herein by reference, in response to Paragraph 18 of the Complaint.

19. Defendants admit that U.S. Patent No. RE37,185 (the '185 patent) bears the title "Optical Head," that it names Isao Satoh, Sadao Mizumo, and Noboru Itoh as inventors, and that it was issued on May 22, 2001. Defendants deny, however, that the '185 patent was duly and legally issued. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 19 of the Complaint, and therefore deny the same.

20. Defendants deny the allegations in Paragraph 20 of the Complaint.

21. Defendants deny the allegations in Paragraph 21 of the Complaint.

22. Defendants deny the allegations in Paragraph 22 of the Complaint.

## AFFIRMATIVE DEFENSES

23. Defendants hereby state the following affirmative defenses to MEI's claims of infringement of the '132 patent, the '487 patent, and the '185 patent (collectively, "the asserted patents").

### First Affirmative Defense (Non-Infringement)

24. Defendants have not infringed and are not infringing any claim of the asserted patents, either directly or indirectly.

### Second Affirmative Defense (Invalidity)

25. The claims of the asserted patents are invalid, void, and/or unenforceable for failure to comply with the conditions and requirements of patentability set forth in the patent statute and rules, Title 35 of the United States Code and Title 37 of the Code of Federal Regulations, and associated rules and law, including without limitation 35 U.S.C. §§ 101, 102, 103, 112, and 251.

### Third Affirmative Defense (Laches)

26. The relief that MEI seeks through this action is barred by the equitable doctrine of laches.

### Fourth Affirmative Defense (Inequitable Conduct)

27. The asserted patents are unenforceable due to inequitable conduct during their prosecution in the United States Patent and Trademark Office (the Patent Office), as set forth in the following paragraphs.

**A. The '132 Patent**

28. The '132 patent is unenforceable due to inequitable conduct. For example, during the pendency of the application that matured into the '132 patent, at least the named inventors or their representatives (collectively, "the applicants") knew of several prior art references that were material to the patentability of the '132 patent and failed to disclose these

references to the Patent Office. The material references that the applicants withheld from the Patent Office include at least Japanese Patent Application Nos. JP-A-61034747, JP-A-62222442, JP-A-62121944, and European Application No. EP-A-0184452.

29. Upon information and belief, the applicants were aware of these references prior to the issuance of the '132 patent, at least because the references were identified in a European Patent Office (EPO) search report. In particular, on June 5, 1989, during the examination of a European counterpart to the '132 patent, and prior to the issuance of the '132 patent, the EPO generated a search report that identified these four prior art references.

30. The applicants did not disclose any of these references to the Patent Office during the pendency of the '132 patent. These references were material to the patentability of the '132 patent, are not cumulative of other information that was disclosed to the Patent Office during the prosecution of the '132 patent, and were withheld from the Patent Office with an intent to deceive.

**B.     The '487 Patent**

31. The '487 patent is unenforceable due to inequitable conduct. For example, during the pendency of the application that matured into the '487 patent, at least the named inventors or their representatives (collectively, "the applicants") knew of several prior art references that were material to the patentability of the '487 patent and failed to disclose these references to the Patent Office. The material references that the applicants withheld from the Patent Office include at least JP7-141786, JP60-067061, and JP62-097179.

32. The applicants were aware of these references prior to the issuance of the '487 patent, at least because the references were identified to the applicants by the Japanese Patent Office (JPO). In particular, while the application for the '487 patent was pending, the JPO cited these and other references as material prior art against the Japanese counterpart application to the '487 patent.

33. The applicants did not disclose any of these references to the Patent Office during the pendency of the '487 patent. These references are material to the patentability of the '487 patent, are not cumulative of other information that was disclosed to the Patent Office

1 during the prosecution of the '487 patent, and were withheld from the Patent Office with an
2 intent to deceive.

**C.  The '185 Patent**

34. The '185 patent is unenforceable due to inequitable conduct. For example, during the pendency of the application that matured into the '185 patent, at least the named inventors or their representatives (collectively, "the applicants") knew of several prior art references that were material to the patentability of the '185 patent and failed to disclose these references to the Patent Office. The material references that the applicants withheld from the Patent Office include at least U.S. Patent No. 4,773,052 (the '052 patent), U.S. Patent No. 4,701,032 ('032 patent), JP 52-153705 (JP '705 patent), JP 60-125945 (JP '945 patent), JP 62-250530 (JP '530 patent), JP 63-313379 (JP '379 patent), JP 64-027046 (JP '046 patent), an excerpt from a book published in 1989 entitled "Rewriteable Laser Disc Material," an excerpt from a book published in 1989 entitled "Laser Discs," an article entitled "Laser Disc System" published in a Japanese journal in November 1981, JP 60-32142, JP 61-210531, an excerpt from a book published in 1988 entitled "New Media Technology Series -- Laser Disc," and a 1986 Nikkei Electronics article excerpt.

35. The applicants were aware of these references prior to the issuance of the '185 patent, at least because the references were identified to the applicants by the EPO and the JPO. In particular, two of these references, the '052 patent and the '032 patent, were cited by the EPO during the examination of the applications for EP 0 862 165 and EP 0 862 166, both of which were European counterparts of the '185 patent. Moreover, the abstract of the JP '705 patent was cited by the EPO in the European Search Report for EP 0 452 953, which also is a European counterpart of the '185 patent. All three references were cited by the EPO prior to the issuance of the '185 patent. In addition, prior to the issuance of the '185 patent, the JPO cited the JP '945 patent, the JP '530 patent, the JP '379 patent, and the JP '046 patent as prior art during the prosecution of a Japanese counterpart application. The remaining references listed above were cited prior to the issuance of the '185 patent during opposition proceedings

against the Japanese counterpart patent, including the oppositions numbered 9-75644-1, 9-75644-3, and 9-75644-4.

36. The applicants did not disclose any of these references to the Patent Office during the pendency of the '185 patent. These references are material to the patentability of the claims in the '185 patent, are not cumulative to the information disclosed during the prosecution of the '185 patent, and were withheld from the Patent Office with an intent to deceive. Moreover, one or more of these references contradict arguments that the applicants made to the Patent Office in order to overcome prior art cited during the prosecution of the '185 patent.

**Fifth Affirmative Defense (License)**

37. The activities alleged to constitute infringement are covered by one or more licenses to the asserted patents.

**Sixth Affirmative Defense (Patent Misuse)**

38. Defendants incorporate by reference the allegations in Paragraphs 27-36, above.

39. Upon information and belief, MEI has committed patent misuse through its licensing behavior, its activities in connection with standard-setting organizations, its activities in connection with patent pooling arrangements relating to the asserted patents, and/or because it has attempted to license and/or enforce the asserted patents even though it knew or should have known them to be invalid and/or unenforceable, as set forth in Paragraphs 27-36.

40. Through its standard-setting, patent pooling, and licensing activities, MEI has conspired with its competitors and other entities with the purpose and effect of unlawfully monopolizing and/or obtaining market power in at least one relevant market. By and through its patents, including the asserted patents, MEI has used its monopoly and/or market power to suppress competition in one or more relevant markets. MEI's acts in this regard, as detailed below, constitute patent misuse and therefore render the asserted patents unenforceable.

41. The relevant markets include at least the technology, licensing, and product markets applicable to high-density optical discs for distribution and/or recording of feature-

1 length films, and the technology, licensing, and product markets for DVD discs, players, and
2 recorders. MEI participates in these markets, has monopoly and/or market power in at least
3 the relevant technology and licensing markets, and exercises that power in at least the relevant
4 licensing and product markets. The relevant markets include both the United States and
5 worldwide geographic markets.

42. The DVD technology involved in this case is associated with a technology standard known as the DVD standard. The standard is allegedly covered by patents owned by at least 10 different companies, including MEI. Today, products made according to the DVD standard represents the vast majority of means for distribution of feature-length films for in-home use. Moreover, use of DVD discs requires the purchase of relatively expensive hardware, such as DVD players or recorders. The large installed base of such equipment, and the significant costs associated with replacing such equipment with potential alternatives, ensure that other distribution means will rarely, if ever, be used as substitutes for DVDs. As a result, DVD discs represent a separate product market from other distribution and recording means, and the licenses to patents for practicing the DVD standard represent a separate licensing market or markets.

43. MEI established its monopoly and/or market power by conspiring with its competitors to foreclose the emergence of competing technology and by improperly manipulating the formulation of what became today's DVD standard. Prior to the establishment of the DVD standard, MEI conspired with its competitors to create a high-capacity optical disc format similar to DVDs, called the SuperDensity disc format (SD format). MEI promoted the SD format in consort with the majority of its competitors in the consumer electronics industry, including Toshiba, Time-Warner, Hitachi, Mitsubishi Electric, Pioneer, and Thomson, (collectively, "the SD Group"). Upon information and belief, the members of the SD Group possessed a majority of worldwide capacity for the research, development, and commercialization of such technology, and agreed amongst themselves to promote a single format rather than developing and promoting competing formats.

44. Upon information and belief, the SD Group devised the SD format so as to maximize the number of entities within the Group who own patents covering the format. The SD group furthered this goal by incorporating unnecessary restrictions in the format that furthered no recognizable procompetitive goal of standard-setting. Rather, the SD Group defined these features so as to preclude the use of unpatented alternatives or otherwise with the goal of ensuring that the format was allegedly covered by patents owned by as many of the Group's members as possible, including MEI's '487 and '185 patents. Upon information and belief, the SD Group pursued this strategy in order to eliminate any incentive of its members to independently develop competing technologies or products and to further preclude competition by erecting substantial barriers to entry into the relevant markets by any entities outside the SD Group. Overall, the anticompetitive effects of this standard-setting process have substantially outweighed any procompetitive effects. Through this standard-setting activity, MEI has attempted to expand the scope of its patents, including the asserted patents, with anti-competitive effect, to reduce or eliminate competition in the licensing of third parties to use the format, and to increase the cost to consumers of using the format.

45. MEI has also committed patent misuse through its participation in the DVD standard-setting organizations, by conspiring with its competitors to monopolize or otherwise suppress competition in one or more relevant markets relating to DVD technology.

46. MEI was a founding member of the DVD Consortium, which later became the DVD Forum. The DVD Forum was a closed consortium formed to define a single standard for high-capacity optical discs, known as DVDs for the distribution and recording of high-resolution video and feature-length films for in-home viewing. On information and belief, the original members of the DVD Forum represent the vast majority of capacity in the world for the design, research, development, and commercialization of optical disc and other consumer electronics products and technologies. Therefore, by participating in the DVD Forum, MEI conspired with most or all of its significant competitors to ensure that no competing technology would emerge.

47. The DVD standard is allegedly covered by numerous patents belonging to most or all of the original members of the DVD Forum. Several of these patents belong to MEI, including the asserted '487 and '185 patents. By attempting to incorporate its patents into the only available DVD standard and refusing to license such patents on commercially reasonable terms, MEI is able to foreclose entry into at least the United States product markets relating to DVDs.

48. Prior to the agreement among the DVD Forum members to develop a single standard, two separate DVD-like formats were being developed by respective consortia of companies who later became the original members of the DVD Forum. One of these formats was the SD format sponsored by MEI and others, as discussed above. The other format, called MultiMedia Compact Disc (MMCD), was sponsored by Philips and Sony. Rather than releasing these two formats to the public as competing alternatives, the sponsors of each format agreed to merge the two formats into a single standard, which became the original DVD standard.

49. Upon information and belief, MEI and other members of the DVD Forum conspired to monopolize one or more relevant markets by devising the DVD standard so that most or all members of the DVD Forum owned patents covering the standard. MEI and the Forum furthered this goal by incorporating unnecessary restrictions or requirements in the standards, so as to ensure that the standard was covered by as many of the DVD Forum members' patents as possible. Many of these restrictions do not further any "procompetitive" goal, such as promoting interoperability among various products that were designed according to the standard. Rather, on information and belief, the members of the DVD Forum selected and defined certain features of the standard in order to preclude the use of unpatented alternatives or otherwise to ensure that most or all of the original DVD Forum members would have patents that allegedly cover the standard. Upon information and belief, the members of the DVD Forum furthered this goal by, inter alia, agreeing to base the DVD standard on the SD format, which was designed with the goal of being covered by patents owned by the SD format's sponsors, but to replace certain features of the SD format with corresponding features

from the MMCD format that are allegedly covered by Philips's and/or Sony's patents. Upon information and belief, this agreement, in combination with agreements among the members to license each other for very small or no royalties and to demand and share much higher royalties from outsiders wishing to implement the standard, had the purpose and/or effect of eliminating any incentive or likelihood that the DVD Forum members would develop or promote competing technologies.

50. The merger of these two consortia and their respective formats into a single standard has caused significant anticompetitive effects in the relevant technology, licensing, and product markets. The merger has eliminated many economic benefits that would have resulted from competition between two or more comparable technologies. For example, the merger of formats has significantly reduced competition for development and use of alternatives to, or improvements of existing features, and has completely eliminated competition in licensing of allegedly essential patents to outside adopters (e.g. through royalty rate competition or competition to improve marketing support or features). Overall, the anticompetitive effects of the DVD standard-setting process have substantially outweighed any procompetitive effects.

51. MEI's standard-setting activities have greatly increased the royalty burden borne by outside parties seeking to implement the DVD standard. MEI's collusion with its competitors in forming the DVD standard has significantly increased the number of patents and the number of licenses allegedly needed to practice the DVD standard. Had the two competing formats not merged into a single standard, for instance, a party seeking to implement one of two or more competing formats would only need to license patents from a subset of the companies that now demand royalties to practice the DVD standard. The merger has forced prospective licensees to negotiate licenses with a larger number of entities and has increased the total amount of demanded royalties and other costs compared with what prospective licensees otherwise would have encountered in a competitive technology and licensing market.

52. The elimination of competition among DVD-like formats has also enabled the DVD Forum members to collude in setting the prices for the licensing of intellectual property allegedly needed to practice the DVD standard, and to set those prices without regard to conditions that would exist in a competitive licensing market. Patents that are allegedly essential to practice the DVD standard are included in various patent pools licensed by the DVD 6C Licensing Agency (6C Agency), of which MEI is a member and exclusive agent for the Americas, as well as a patent pool known as the DVD 3C patent pool, which is administered by Philips. In the absence of competition for licensees, MEI, the 6C Agency, and others have agreed to set, and are attempting to extract royalties for their patents at rates that greatly exceed the rates that could be obtained in a competitive marketplace. By its successful efforts to preclude the emergence of competing technologies, MEI has left potential licensees with no alternative but to accept the terms demanded by MEI and the 6C Agency, however unreasonable, or to shut down operations or face litigation.

53. With respect to the accused products, the unlawfully inflated royalty burden collectively demanded by the respective DVD Forum members represents such a large portion of the overall cost of the downstream products that it would preclude companies like CMC from participating in the relevant product markets. Therefore, MEI's standard-setting activities and subsequent efforts to enforce its related patents, if successful, will create insurmountable barriers to entry into, and will substantially reduce output and/or substantially increase prices in the relevant product markets, thereby harming consumers.

54. Through its standard-setting activities in connection with the DVD Forum and by impermissibly conspiring with other members thereof, MEI has expanded the scope of the '185 and '487 patents beyond their proper statutory bounds, with anticompetitive effect, thereby rendering them unenforceable.

55. Upon information and belief, MEI has committed patent misuse through its patent pooling and licensing activities, at least because it has tied licenses for non-essential patents to licenses for patents allegedly essential to practice the DVD standard.

56. MEI's DVD-related patents are licensed in "patent pools" that combine MEI's patents with those of several of its competitors and other entities. The patent pools are licensed on MEI's behalf by the 6C Agency, which administers a licensing program involving the patents of a consortium of at least nine companies: MEI; Toshiba Corporation; Mitsubishi Electric Corporation; Victor Co. of Japan; Hitachi Ltd.; Warner Bros. Home Entertainment Inc.; Samsung Electronics Co., Ltd.; Sanyo Electric Company; and Sharp Corporation.

57. MEI is one of the six founding members of the 6C Agency and its licensing program, and acts as the 6C Agency's exclusive regional agent for the Americas. Under the 6C Agency's licensing program, MEI and its co-conspirators agreed to license "each other and third parties to make, use and sell DVD Products under their present and future patents that are essential to doing so." The 6C Agency, under MEI's direction, licenses these DVD-related patents to companies outside of the 6C Agency.

58. More than four hundred patents allegedly relating to DVD technology are currently being licensed by the 6C Agency, including the '487 and '185 patents being asserted in this litigation. These patents are organized into numerous patent pools, each of which is directed to a specific type of DVD product (e.g. DVD-Video discs or DVD-RW discs). The 6C Agency does not offer licenses to individual patents in the pools, but instead only licenses each patent as part of an entire package of patents.

59. The '185 and '487 patents are licensed through the 6C Agency. They are included in several of the aforementioned patent pools, including at least the pools associated with the following DVD formats: DVD-ROM, DVD Video, DVD Audio, DVD-R, DVD-RW, and DVD-RAM. In order to take a license from the 6C Agency, a prospective licensee must take and pay for a license for an entire package of patents. Patents cannot be licensed individually from the 6C Agency. Moreover, upon information and belief, to the extent that MEI offers licenses to its own allegedly essential patents apart from the 6C Agency, the package licenses MEI offers also contain non-essential patents.

60. Upon information and belief, MEI and the 6C Agency acting on MEI's behalf, have tied non-essential patents to allegedly essential patents in the patent pools. For

instance, although MEI and the 6C Agency claim that all patents in the patent pools they offer are essential to practice the DVD standard, a proper essentiality analysis has not been applied in analyzing patents for inclusion in the patent pools. Upon information and belief, the outside analyst who was retained to conduct an essentiality analysis included patents in the pools if he believed that any claim read directly on a feature of the corresponding standard or if they were deemed to be "essential as a practical matter" because there was no realistic alternative to using them. Contrary to his analysis, however, there are realistic alternatives to the so-called essential patents in the patent pools. As a result, the pools contain non-essential patents.

61. MEI has supported, endorsed, and benefited from the aforementioned activities of the 6C Agency. Such licensing activities have harmed innovation and competition in the markets for development and licensing of optional implementation technologies for DVD products that would otherwise compete with the aforementioned non-essential patents if such patents were not tied to allegedly essential patents in the patent pools. The anticompetitive effects that result from this tying outweigh any procompetive effect that these activities might have. As a result, through its activities in connection with the 6C Agency, and through its own licensing activities, MEI has impermissibly expanded the scope of the '185 and '487 patents, thereby rendering them unenforceable.

62. MEI has also committed patent misuse with respect to all of the asserted patents by attempting to license and/or enforce the asserted patents even though it knew or should have known them to be invalid and/or unenforceable, as set forth in Paragraphs 27-36.

## COUNTERCLAIMS

Defendants assert the following counterclaims against MEI.

### Parties

1. CMC is a corporation organized and existing under the laws of Taiwan, ROC, with its principal place of business located at 53 W. Ming Chuan Rd., 15th Floor, Taipei, Taiwan, R.O.C.

2. Hotan is a corporation organized and existing under the laws of California, with its principal place of business located at 751 North Canyons Parkway, Livermore, California.

3. KHypermedia is a corporation organized and existing under the laws of California, with its principal place of business located at 789 North Canyons Parkway, Livermore, California.

4. Plaintiff MEI is a Japanese corporation with its principal place of business in Kadoma-shi, Osaka, Japan.

**Jurisdiction and Venue**

5. This is an action for declaratory relief for which this Court has jurisdiction under 15 U.S.C. §§ 1331, 1338, and 2201.

6. This Court has personal jurisdiction over MEI at least by virtue of MEI expressly submitting to the jurisdiction of the Court by filing this action for patent infringement. In addition, upon information and belief, MEI has conducted and continues to conduct business within the State of California and in this District relating to its assertion and exploitation of the asserted patents.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 because MEI is subject to personal jurisdiction in this District, because MEI is an alien, and because a substantial part of the events giving rise to the counterclaims have occurred in this District.

8. An actual case or controversy exists between the parties by virtue of the allegations raised in MEI's Complaint regarding the alleged patent infringement by Defendants and by virtue of Defendants' affirmative defenses.

**First Counterclaim (Declaratory Judgment of Non-Infringement)**

9. Defendants incorporate by reference the allegations in Paragraphs 1-8 of the Counterclaims, above.

10. MEI asserts in this litigation that Defendants have infringed and are infringing the asserted patents.

11. Defendants have not infringed nor are they currently infringing any claim of the asserted patents.

12. Accordingly, Defendants seek a judgment declaring that they have not infringed and currently are not infringing any claim of the asserted patents, either directly, contributorily, or by inducement.

**Second Counterclaim (Declaratory Judgment of Invalidity)**

13. Defendants incorporate by reference the allegations in Paragraphs 1-8 of the Counterclaims, above.

14. MEI asserts in this litigation that Defendants have infringed and are infringing the asserted patents and that the asserted patents were duly and legally issued.

15. The asserted patents are invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code and Title 37 of the Code of Federal Regulations and associated rules and law, including without limitation 35 U.S.C. §§ 101, 102, 103, 112, and 251.

16. Accordingly, Defendants seek a judgment declaring that the asserted patents are invalid.

**Third Counterclaim (Declaratory Judgment of Unenforceability for Inequitable Conduct)**

17. Defendants incorporate by reference the allegations in Paragraphs 1-8 of the Counterclaims, above.

18. MEI asserts in this litigation that Defendants have infringed and are infringing the asserted patents.

19. The asserted patents are unenforceable at least because the inventors and/or their representatives committed inequitable conduct before the Patent Office during prosecution of the asserted patents.

**A.     The '132 Patent**

20. The '132 patent is unenforceable due to inequitable conduct. For example, during the pendency of the application that matured into the '132 patent, at least the named inventors or their representatives (collectively, "the applicants") knew of several prior art

references that were material to the patentability of the '132 patent and failed to disclose these references to the Patent Office. The material references that the applicants withheld from the Patent Office include at least Japanese Patent Application Nos. JP-A-61034747, JP-A-62222442, JP-A-62121944, and European Application No. EP-A-0184452.

21. Upon information and belief, the applicants were aware of these references prior to the issuance of the '132 patent, at least because the references were identified in a European Patent Office (EPO) search report. In particular, on June 5, 1989, during the examination of a European counterpart to the '132 patent, and prior to the issuance of the '132 patent, the EPO generated a search report that identified these four prior art references.

22. The applicants did not disclose any of these references to the Patent Office during the pendency of the '132 patent. These references were material to the patentability of the '132 patent, are not cumulative of other information that was disclosed to the Patent Office during the prosecution of the '132 patent, and were withheld from the Patent Office with an intent to deceive.

**B.      The '487 Patent**

23. The '487 patent is unenforceable due to inequitable conduct. For example, during the pendency of the application that matured into the '487 patent, at least the named inventors or their representatives (collectively, "the applicants") knew of several prior art references that were material to the patentability of the '487 patent and failed to disclose these references to the Patent Office. The material references that the applicants withheld from the Patent Office include at least JP7-141786, JP60-067061, and JP62-097179.

24. The applicants were aware of these references prior to the issuance of the '487 patent, at least because the references were identified to the applicants by the Japanese Patent Office (JPO). In particular, while the application for the '487 patent was pending, the JPO cited these and other references as material prior art against the Japanese counterpart application to the '487 patent.

25. The applicants did not disclose any of these references to the Patent Office during the pendency of the '487 patent. These references are material to the patentability of the

'487 patent, are not cumulative of other information that was disclosed to the Patent Office during the prosecution of the '487 patent, and were withheld from the Patent Office with an intent to deceive.

**C.     The '185 Patent**

26.     The '185 patent is unenforceable due to inequitable conduct. For example, during the pendency of the application that matured into the '185 patent, at least the named inventors or their representatives (collectively, "the applicants") knew of several prior art references that were material to the patentability of the '185 patent and failed to disclose these references to the Patent Office. The material references that the applicants withheld from the Patent Office include at least U.S. Patent No. 4,773,052 (the '052 patent), U.S. Patent No. 4,701,032 ('032 patent), JP 52-153705 (JP '705 patent), JP 60-125945 (JP '945 patent), JP 62-250530 (JP '530 patent), JP 63-313379 (JP '379 patent), JP 64-027046 (JP '046 patent), an excerpt from a book published in 1989 entitled "Rewriteable Laser Disc Material," an excerpt from a book published in 1989 entitled "Laser Discs," an article entitled "Laser Disc System" published in a Japanese journal in November 1981, JP 60-32142, JP 61-210531, an excerpt from a book published in 1988 entitled "New Media Technology Series -- Laser Disc," and a 1986 Nikkei Electronics article excerpt.

27.     The applicants were aware of these references prior to the issuance of the '185 patent, at least because the references were identified to the applicants by the EPO and the JPO. In particular, two of these references, the '052 patent and the '032 patent, were cited by the EPO during the examination of the applications for EP 0 862 165 and EP 0 862 166, both of which were European counterparts of the '185 patent. Moreover, the abstract of the JP '705 patent was cited by the EPO in the European Search Report for EP 0 452 953, which also is a European counterpart of the '185 patent. All three references were cited by the EPO prior to the issuance of the '185 patent. In addition, prior to the issuance of the '185 patent, the JPO cited the JP '945 patent, the JP '530 patent, the JP '379 patent, and the JP '046 patent as prior art during the prosecution of a Japanese counterpart application. The remaining references listed above were

cited prior to the issuance of the '185 patent during opposition proceedings against the Japanese counterpart patent, including the oppositions numbered 9-75644-1, 9-75644-3, and 9-75644-4.

28. The applicants did not disclose any of these references to the Patent Office during the pendency of the '185 patent. These references are material to the patentability of the claims in the '185 patent, are not cumulative to the information disclosed during the prosecution of the '185 patent, and were withheld from the Patent Office with an intent to deceive. Moreover, one or more of these references contradict arguments that the applicants made to the Patent Office in order to overcome prior art cited during the prosecution of the '185 patent.

29. Accordingly, Defendants seek a judgment declaring that the asserted patents are unenforceable due to inequitable conduct.

**Fourth Counterclaim (Declaratory Judgment of Unenforceability for Patent Misuse)**

30. Defendants incorporate by reference the allegations in Paragraphs 1-8 and 17-29 of the Counterclaims and Paragraphs 40-61 of Defendants' Amended Answer (sixth affirmative defense for patent misuse), above.

31. Upon information and belief, MEI has committed patent misuse through its licensing behavior, its activities in connection with standard-setting organizations, and its activities in connection with patent pooling arrangements relating to the asserted patents, as set forth above in Paragraphs 40-61 of Defendants' Amended Answer (sixth affirmative defense for patent misuse). MEI has also committed patent misuse because it has attempted to license and/or enforce the asserted patents even though it knew or should have known them to be invalid and/or unenforceable, as set forth in Counterclaim Paragraphs 17-29. The asserted patents are unenforceable as a result of MEI's patent misuse.

32. Accordingly, Defendants seek a judgment declaring that the asserted patents are unenforceable due to patent misuse.

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request that this Court enter judgment in their favor and grant the following relief:

Case No. C 06-04538 WHA    - 18 -    DEFENDANTS' AMENDED ANSWER AND COUNTERCLAIMS

1. Dismissal with prejudice of MEI's claims against Defendants and an order that MEI take nothing as a result of the Complaint;

2. Judgment that each of MEI's asserted patents is not infringed by Defendants, either directly or indirectly;

3. Judgment that each of MEI's asserted patents is invalid;

4. Judgment that each of MEI's asserted patents is unenforceable by reason of inequitable conduct and/or patent misuse;

5. Judgment that MEI's requested relief is barred by laches;

6. An order requiring that MEI pay all of the Defendants' costs associated with this suit, including attorney fees incurred in defense pursuant to 35 U.S.C. § 285;

7. Any and all other relief the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Defendants request a trial by jury in this matter on all issues so triable.

Dated: November 29, 2006

SONNENSCHEIN NATH & ROSENTHAL LLP

By _____
RICHARD G. GREEN

Attorneys for Defendants
CMC Magnetics Corp., Hotan Corp., and KHypermedia Corp.